## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **SALVADOR CUELLAR-RAMIREZ** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14-cv-00599-JPG-SCW** |
| | ) | |
| **DR. KRUSE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

Plaintiff, Salvador Cuellar-Ramirez, who is currently incarcerated at the Eden Correctional Institution in Eden, Texas, brought a *pro se* civil rights claim pursuant to 42 U.S.C. §1983. (Doc. 1, p.2). Plaintiff filed his claim on April 24, 2014, in the Northern district of Texas. (Doc. 1). The case was later transferred to this Court on June 17, 2014. (Doc. 14, p.1). Plaintiff's claim arose during his incarceration at Federal Correctional Institution Greenville ("FCI-Greenville"). (Doc. 1). His claim was later construed to include Dr. Kruse ("Defendant") as a Defendant based on allegations that he knowingly and purposely delayed care for Plaintiff's eye problem, both before and after surgery, and all other defendants were dismissed. (Doc. 14, p. 4).

On February 1, 2016, Defendant moved for Summary Judgment. (Doc 40.) Plaintiff did not file a response to Defendant's Motion for Summary Judgment, therefore, the Court considers Plaintiff's failure to respond an admission of the merits of

Defendant's motion.  **SDIL Local Rule 7.1(c).**  *See also Smith v. Lamz*, **321 F.3d 680, 683 (7th Cir. 2003);** *Flynn v. Sandahl*, **58 F.3d 283, 288 (7th Cir. 1995) (a failure to respond constitutes an admission that there are no undisputed material facts)**. For the following reasons the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED**. (Doc. 40).

## FACTUAL BACKGROUND

Plaintiff was incarcerated at FCI-Greenville from January 5, 2010, to August 8, 2012. (Doc. 40-3, p. 3). The day he arrived there, his medical screening revealed a history of Diabetes and hypertension; he was prescribed medications and placed in the Choric Care Clinic ("CCC")—A clinic providing access to physicians at least once every twelve months, or more often if clinically indicated. (Doc. 40-3, p. 3, 15). Later, on January 12, 2010, during Plaintiff's first visit to the CCC, blood tests and a vision screen were ordered By PA-C Adesanya. (Doc. 40-3, p. 21). The initial eye exam was ordered because patients suffering from diabetes are at a higher risk for eye damage. (Doc. 40-3, p. 3 n. 4). Plaintiff also visited Health Services on February 2 and 25, 2010, but neither appointment was due to complaints about his eyesight; the first appointment was to renew Plaintiff's hypertension and diabetes medications; the second appears to be a routine check-up. (Doc. 40-3, p. 25-27).

Defendant began working at FCI-Greenville as the Clinical Director on January 30, 2011. (Doc. 40-3, p. 2). As the Clinical Director, Defendant was responsible for overseeing the clinical functions of the Health Services Department. (Doc. 40-3, p. 2). Defendant's position required him to evaluate whether or not inmates required health

care from a provider outside FCI-Greenville. (Doc. 40-3, p. 2-3). Though Defendant is a general practitioner, he is not trained nor qualified to treat the eye condition that affected Plaintiff. (Doc. 40-3, p. 11). Defendant duties, instead, were to refer patients to a specialist for diagnosis and treatment. (Doc. 40-3, p. 11). Additionally, as clinical director, Defendant did not oversee administrative functions; instead, the Health Services Administrator held this responsibility. (Doc. 40-3, p.2)  Because of mandatory training when Defendant was first hired, Defendant was unable to see patients between January 31 to February 11, and March 15-31, 2011. (Doc. 40-3, p. 2).

Plaintiff first began complaining of vision problems March 1, 2010, when Plaintiff reported to Dr. Montogmery— a direct contract optometrist—that he had broken his glasses. (Doc. 40-3, p. 2, 4, 30). The exam showed that Plaintiff's had a "narrow Angle non-occludable hyperopic/Presbyopic," which should be monitored. (Doc. 40-3, p. 31). Dr. Montgomery ordered a follow-up in six months and new glasses for Plaintiff. (Doc. 40-3, p. 31). Plaintiff did not receive these glasses for three months. (Doc. 40-6, p.9-10). Dr. Harvey—the Regional Medical Director for the North Central Region of the BOP— cosigned Dr. Montgomery's order. (Doc. 40-3, p. 4, 33).

During the next four medical appointments, which spanned from March 25, 2010, to September 29, 2010, Plaintiff did not complain of visions problems. (Doc. 40-3, p. 34, 37, 42, 47). These visits consisted of a sore throat, and additional visits aimed at refilling Plaintiff's medication for his chronic conditions. (Doc. 40-3, p. 34, 44-45, 49). These prescriptions consisted of one 81 MG tablet of Aspirin taken once daily for 180 days, a 5 MG tablet of GlyBURIDE taken twice daily for 180 days, a 5 MG tablet of

Lisinopril, ½ tablet taken once daily for 180 days, and a 500 MG tablet of MetFORMIN taken twice daily for 180 days. (Doc. 40-3, p. 64). During these visits, Plaintiff's current conditions were described as "not improved/same," or "improved" (Doc. 40-3, p. 39, 44, 49). None of these visits were cosigned or approved by Defendant. (Doc. 40-3, p. 41, 46, 51).

Plaintiff's complaints of vision problems resumed during an appointment on October 4, 2010, but were not due to eyeglass complications. (Doc. 40-3, p. 52.) There, Dr. Montgomery examined Plaintiff and determined that Plaintiff was suffering from a narrowing iris angles with a potential for occlusion/diabetic retinopathy, and requested a consult for a laser peripheral iridotomy ("LPI"), followed by a retina consult. (Doc. 40-3, p. 53). At some point, Dr. Harvey approved this request, and Naphcare scheduled an appointment. (Doc. 40-3, p. 4).

Dr. Maher examined Plaintiff as the consult on October 26, 2010, and recommended a LPI for Plaintiff's right eye. (Doc. 40-3, p. 57). Plaintiff received this recommended procedure two months later on December 27, 2010, without complication. (Doc. 40-3, p. 58). Dr. Maher's post-operation plan called for a prescription for Xibrom, to be administered twice a day for five days, and a follow-up in 1-2 weeks for a LPI in his left eye. (Doc. 40-3, p. 58). The medical records indicate that this medication was non-formulary, and was substituted with Dictofenac, which called for an application of three times a day for five days. (Doc. 40-3, p. 61). Plaintiff testified in his deposition that he did not receive these drops until 1-2 days after this appointment. (Doc. 40-6, p. 13). Plaintiff also testified that once he received the

4

medication, he took the drops for five days as prescribed, but does not indicate whether they were taken twice-daily or three-times daily. (Doc. 40-6, p. 13). Administrative medical records confirm the above assessment, the prescribed meds and changes to those orders, and confirm that the prison received the Dr. Maher's plan and notes. (Doc. 40-3, p. 59, 61). Dr. Harvey cosigned Dr. Maher's orders the next day, and PA-C Adesanya reviewed them on January 4, 2011. (Doc. 40-3, p.60).

Plaintiff's had another medical appointment on January 20, 2011, but again did not complain of vision problems. (Doc. 40-3, p. 62-63). This appointment took place at the CCC and was not the follow-up requested by Dr. Maher's office following the surgery. (Doc. 40-3, p. 62). There, PA-C Adesanya examined Plaintiff and assessed that Plaintiff's hypertension and Diabetes were improving, and made requests for new blood tests and renewed Plaintiff's hypertension and diabetic prescriptions. (Doc. 40-3, p. 64). Adesanya instructed Plaintiff to follow-up as needed. (Doc. 40-3, p. 64). Dr. Harvey cosigned these orders the same day. (Doc. 40-3, p. 66).

It appears that Plaintiff was scheduled to see Dr. Maher on February 23, 2011, but it is not clear if this appointment was to be the follow-up that was recommended following the surgery. (Doc 40-3, p. 68). Regardless, Dr. Maher's office cancelled this appointment the day before. (Doc. 40-3, p. 68). Lee Pollman, a registered health information administrator and Health Services Administrator ("RHIA/HSA"), completed this administrative note. (Doc. 40-3, p. 68).

Defendant's first involvement occurred on April 11, 2011, when he cosigned Plaintiff's April 8, 2011, appointment at the CCC. (Doc. 40-3, p. 69, 74). At this

appointment, PA-C Adesanya again examined plaintiff. (Doc. 40-3, p. 69). The medical records indicate that Plaintiff "[felt] fine," but he has not been fully compliant with his medication. (Doc. 40-3, p. 69). Plaintiff appeared well, with no distress, but his glaucoma was the "same/not improved," based on a status date of December 28, 2010. (Doc. 40-3, p. 64, 72). All tests carried out during the exam were normal. (Doc. 40-3, p. 71). PA-C Adesanya again renewed Plaintiff's prescription plan for his hypertension and diabetes. (Doc. 40-3, p. 72). Plaintiff was to follow-up "as needed." (Doc. 40-3, p. 73).

Sometime after the April 8 appointment, Plaintiff's vision in his left eye began to deteriorate further. (Doc. 40-3, p. 76). Plaintiff filed a medical request to the Health Care unit seeking an eye doctor on May 17, 2011. (Doc. 40-3, p. 76). In this request, Plaintiff indicated that he was having problems seeing out of his left eye; that his vision was "blurry," that the left eye was tearing excessively, and that "[prior to his surgery] this wasn't happening."(Doc. 40-3, p. 76). Plaintiff expressed concerns that these complications in his left eye were also affecting his right eye. (Doc. 40-3, p. 76). Plaintiff requested to be seen "as soon as possible" by the medical staff. (Doc. 40-3. p. 76). Plaintiff testified in his deposition that he informed the medical staff that his eyesight was getting worse following his surgery. (Doc. 40-6, p. 14). This request was not reviewed until June 3, 2011, in which a cursory response of, "[plaintiff] on call to see me," was provided by unknown personal. [1] (Doc. 40-3, p. 76).

_____

[1] The respondent is unknown because the signature is illegible.

Having not gotten a response to the first request, Plaintiff sent an additional medical request to "Pollman/Medical" roughly 3 weeks later on June 6, 2011. (Doc. 40-3, p. 77). In this request, Plaintiff explained that he was experiencing severe headaches, and he could no longer see out of his left eye. (Doc. 40-3, p. 77). Plaintiff felt that these complications might be a result of his surgery, and that he "urgently needed to be seen by a doctor." (Doc. 40-3, p. 77). Additionally, Plaintiff requested an interpreter for the visit because he was concerned that his lack of proficiency in English would preclude him from comprehending the diagnoses. (Doc. 40-3, p. 77). Pullman responded the same day, and informed plaintiff that these concerns could not be due to his surgery because it was performed on his right eye, rather than his left. (Doc. 40-3. p. 77). The response further informed Plaintiff that the same procedure performed on his right eye was scheduled to be performed on his left, and if he has any problems prior to that appointment, he will need to sign up for a sick call and discuss it with the P/A. (Doc 40-3, p. 77).

Two weeks after the second request, Dr. Montgomery saw Plaintiff on June 20, 2011. (Doc. 40-3, p. 78). Using a translator, Plaintiff informed Dr. Montgomery that his left eye was very blurry, that his right eye was cloudy, and he was seeing spots. (Doc. 40-3, p. 78). Dr. Montgomery's exam indicated that Plaintiff's left eye still had a very narrow angle, showed decreased vision and a vitreous hemorrhage, and that he needed a LPI consult "ASAP", and then a retina consult. (Doc. 40-3, p. 79). The following day Defendant cosigned this plan. (Doc. 40-3, p. 81).

The medical records indicate that on June 21, 2011, Melany Goldstein, an RN, entered an administrative note regarding Dr. Montgomery's plan. (Doc. 40-3, p. 82). The note indicates Plaintiff was currently scheduled for laser eye surgery on August 19, 2011, but because Dr. Montgomery requested an earlier date, and Plaintiff's urgent need for a retinologist consult, HSA and Jeffery Notts were informed to schedule an earlier surgery, if possible. (Doc. 40-3, p. 82). Defendant cosigned this note on the same day. (Doc. 40-3, p. 83). Defendant declares in an affidavit that he reviewed Dr. Montgomery's notes and asked the staff to obtain an earlier appointment. (Doc. 40-3, p. 6).  A subsequent administrative note completed the same day by Jeffery Nott, notes that the mid-July reschedule was for a consult appointment rather than surgery. (Doc. 40-3, p. 85).

Plaintiff missed an appointment with Defendant at the CCC on July 14, 2011, and the appointment was rescheduled. (Doc. 40-3, p. 86).

Based on the request for an earlier appointment, Dr. Fleming examined Plaintiff on July 15, 2011. (Doc 40-3, p. 91). Aspects of Dr. Fleming's exam are illegible, but it is clear that he found a vitreous hemorrhage in Plaintiff's left eye. (Doc. 40-3, p. 91). Dr. Fleming's exam notes were not sent back with Plaintiff the day of the appointment; rather, HSA received them on July 18, 2011, via fax. (Doc. 40-3, p. 87, 91). Defendant's review of the actual notes occurred on July 25, 2011. (Doc. 40-3, p. 92). Though earlier records indicate that Plaintiff was already scheduled for an August 19 LPI surgery for his left eye, Dr. Fleming merely requested Plaintiff follow-up with Fleming in one

month for an RPR if the blood clears. (Doc. 40-3, p. 82, 93). Defendant cosigned this note on July 21, 2011. (Doc. 40-3, p. 95).

It is unclear when or if the one-month follow-up occurred; the record contains a memorandum from the Utilization Review Committee ("URC") dated July 29, 2011, approving an eye appointment; additionally, a consultation, generated on August 2, 2011, indicates a diagnoses of a non-clearing vitreous hemorrhage in the left eye and calls for vitretomy/endoparrentinal laser surgery for Plaintiff's left eye. (Doc. 40-3, p. 102). While these dates correspond to late July and early august, the record does not contain documentation of an appointment with Dr. Fleming until August 31, 2011. (Doc. 40-3, p. 104).

Prior to the August 31 appointment, Plaintiff continued to complain of vision problems at his next appointment with Defendant on August 8, 2011. (Doc. 40-3, p. 97). At this appointment, Plaintiff also informed Defendant that he had an operation scheduled for his left eye. (Doc. 40-3, p. 97). Defendant noted that Plaintiff's Glaucoma and diabetes had not improved, and ordered a renewal of his current prescriptions. (Doc. 40-3, p. 99-100). Defendant informed Plaintiff to follow-up "as needed." (Doc. 40-3, p. 100).

The records indicate that Plaintiff again saw Dr. Fleming on August 31, 2011. (Doc. 40-3, p. 104, 107). Dr. Fleming again noted the non-clearing vitreous hemorrhage in Plaintiff's left eye, and recommended vitrectomy/endoparrentinal laser surgery. (Doc. 40-3, p. 104).  Defendant then cosigned these orders on September 1, 2011. (Doc.

40-3, p. 105).  Later, on September 14, 2011, the URC approved the Ophthalmology laser surgery. (Doc. 40-3, p. 109).

Afterwards, October 3, 2011, Dr. Montgomery again saw Plaintiff to review the retina consult. (Doc. 40-3, p. 110). Dr. Montgomery further recommended the surgery be completed. (Doc. 40-3, p. 110). Dr. Harvey cosigned this administrative note. (Doc. 40-3, p. 112).

While awaiting surgery, Plaintiff visited health services on November 21, 2011, for an unscheduled appointment due to complications with his left eye. (Doc. 40-3, p. 113). The chart notes that Plaintiff denied experiencing any pain, but said that his vision was blurry. (Doc. 40-3, p. 113). PA-C Adesanya scheduled Plaintiff for an appointment with an optometrist, noting that the doctor would be available in two days, and informed plaintiff to follow-up as needed. (Doc. 40-3, p. 114).

Two days later, on November 23, 2011, Plaintiff saw Dr. Montgomery. (Doc. 40-3, p. 115). The record indicates that Dr. Montgomery felt there was slight improvement in Plaintiff's left eye, but recommended proceeding with the surgery. (Doc. 40-3, p.115, 118). Defendant cosigned this order the same day. (Doc. 40-3, p. 116).

In anticipation of Plaintiff's surgery, he received a physical, and an EKG was ordered. (Doc. 40-3, p. 121-122). Records indicate that on November 28, 2011, Plaintiff was cleared for surgery. (Doc. 40-3, p. 120, 121). Later, on December 2, 2011, the EKG was ordered by PA-C Adesanya. (Doc. 40-3, p. 122). Additionally, on this date, Plaintiff consented to the surgery by signing and dating a consent form. (Doc. 40-3, p. 123).

Plaintiff received the scheduled surgery on December 6, 2011, about two and a half months after the UCR approved it. (Doc. 40-3, p. 109, 124, 127). Dr. Fleming, who performed the surgery, recommended a follow-up appointment. (Doc. 40-3, p. 124). Plaintiff was sent home with no instructions limiting his behavior, but was given a patch for his left eye. (Doc. 40-3, p. 129). Additionally, Plaintiff was given two eye drop prescriptions; Ciloxan solution and Pred Forte 1%, each with instructions to take one drop four times a day. (Doc. 40-3, p. 129-131). Defendant cosigned the administrative note that documented the above on December 7, 2011. (Doc. 40-3, p. 125). The URC approved the follow-up on December 8, 2011, and Mr. Nott was notified on December 13, 2011. (Doc. 40-3, p. 135).

On December 21, 2011, Plaintiff attended his follow-up with Dr. Fleming. (Doc. 40-3, p. 139). At this visit, Plaintiff informed Dr. Fleming that he has been experiencing pain in both his eyes and that he is unable to see. (Doc. 40-3, p. 139). Plaintiff indicated that he has been experiencing this for the last three weeks. (Doc. 40-3, p. 139). Dr. Fleming noticed that Plaintiff still had residual blood that needed to be cleared, and that the same surgery should be performed on Plaintiff's right eye. (Doc. 40-3, p. 140). The administrative note entered by RN Goldstein, makes note of the need for an additional surgery but did not make note of the concerns and symptoms discussed by Plaintiff during the follow-up. (Doc. 40-3, p. 136). Dr. Harvey cosigned the administrative note documenting Plaintiff's follow-up on December 21, 2011. (Doc. 40-3, p. 137).

Plaintiff initiated a sick call on January 9, 2012, with Health services regarding his eyes. (Doc. 40-3, p. 144). Plaintiff complained of pain and vision loss in his left eye,

as well as decreased vision in his right eye. (Doc. 40-3, p. 144). The chart notes that another inmate led Plaintiff to Health services. (Doc. 40-3, p. 144). PA-C Gillian recommended that Plaintiff be transferred to a local hospital and that the ophthalmologist office be contacted to determine where Plaintiff should be sent for evaluation. (Doc. 40-3, p. 145). The same day Plaintiff was transferred to Dr. Fleming who performed a fluid-to-fluid exchange and vision in Plaintiff's left eye improved. (Doc. 40-3, p. 150). Additionally, Dr. Fleming again suggested that surgery be performed on Plaintiff's right eye. (Doc. 40-3, p. 147).

On January 11, 2012, Plaintiff had a follow-up with Dr. Fleming. (Doc. 40-3, p. 152). The records note that Plaintiff's vision was getting better in his left eye, though it was a little tender to the touch. (Doc. 40-3, p. 152). Dr. Montgomery inquired about the tenderness in Plaintiff's eyes, and was informed by Dr. Fleming's office that the fluid-to fluid exchange will cause tenderness, and that the condition should improve in four to five days. (Doc. 40-3, p, 152). Dr. Harvey cosigned this order. (Doc. 40-3, p. 153).

Following approval by the URC board on January 25, 2012, Dr. Fleming performed surgery on Plaintiff's right eye on January 31, 2012. (Doc. 40-3, p. 164- 165). The same medications and precautions that were prescribed for his left eye were prescribed for his right eye. (Doc. 40-3, p. 165-166). An administrative note entered on February 2, 2012, confirms that BOP received the prescriptions and ordered the medication; Defendant cosigned this ordered on the same day. (Doc. 40-3, p. 177-178). Prior to the surgery, Plaintiff was cleared for surgery, provided with instructions regarding the surgery, and provided consent. (Doc. 40-3, p. 169-170, 172). A post-

operation report of the surgery states that there were no complications during the procedure. (Doc. 40-3, p. 173).

Plaintiff had a follow-up with Dr. Fleming on February 2, 2012. (Doc. 40-3, p. 179). The record provides little information regarding this follow-up, but Dr. Fleming noted improvement in Plaintiff's eye, and requested an additional follow-up in one month. (Doc. 40-3, p. 179). Defendant cosigned this note on the same day. (Doc. 40-3, p. 180).

Plaintiff's regular hypertension and diabetes medication was renewed on February 8, 2012, at Health services. (Doc. 40-3, p. 185). PA-C Gillian renewed the prescriptions. (Doc. 40-3, p. 185).

On February 13, 2012, prior to the scheduled one-month follow-up date, Plaintiff had another consultation with Dr. Fleming,  (Doc. 40-3, p. 191). At this appointment, Dr. Fleming noted that Plaintiff's condition was the same as the last visit, and requested another one-month follow-up. (Doc. 40-3, p. 186, 191). This second requested follow-up was approved by the URC on February 15, 2012, and Mr. Nott was notified on this approval on February 17, 2012. (Doc. 40-3, p. 193).

Plaintiff had an additional follow-up with Dr. Fleming on March 12, 2012. (Doc. 40-3, p. 194). The report indicates that Plaintiff still had vitreous blood in his left eye, and that there was no vision. (Doc. 40-3, p. 189). Plaintiff reported the vision in his left eye was very blurry. (Doc. 40-3, p. 199). The report also suggests that Plaintiff will need cataract surgery "sometime soon" for his right eye. (Doc. 40-3, p. 189). Dr. Fleming requested an additional follow-up in two months during this visit. (Doc. 40-3, p. 194).

This follow-up was approved by the UCR on March 14, 2012, and notice was provided to Mr. Nott on March 16, 2012. (Doc. 40-3, p. 201). Additionally, Defendant cosigned the order the following day. (Doc. 40-3, p. 197).

Plaintiff visited Heath Services on March 19, 2012, where Defendant treated him. (Doc. 40-3, p. 202). There, it was noted that Plaintiff's blood sugar was running high during the times that Plaintiff had checked them. (Doc. 40-3, p. 202). Plaintiff would visit the commissary on a nearly weekly basis and often purchase foot items that are traditionally high in sugar. (Doc 40-5). At this appointment, Plaintiff informed Defendant that he could not see out of his left eye, and this his right eye was functioning at about 70%. (Doc. 40-3, p. 202). Plaintiff's current medications were renewed and he was also prescribed an additional med for his hypertension. (Doc. 40-3, p. 204).

Plaintiff's next medical appointment was scheduled for May 5, 2012, with Defendant at Health Services, but Plaintiff did not show. (Doc. 40-3, p. 209).

On May 7, 2012, Plaintiff had another appointment with Dr. Fleming. (Doc. 40-3, p. 210). The consultation report indicates that Plaintiff needed total laser treatment for right eye, and that the left eye was to be observed for future consideration pending the blood clearing from the eye. (Doc. 40-3, p. 214). The same day Plaintiff filed a "request to staff members" inquiring about whether he was scheduled for an eye surgery. (Doc. 40-3, p. 216).  May 9 2012, Plaintiff received a response informing him that the results from the May 7th appointment have not been received and the surgery would be discussed at the next URC meeting. (Doc. 40-3, p. 216). The UCR reviewed Plaintiff's

files the same day and deferred disposition pending a review of the May 7th appointment. (Doc. 40-3, p. 222). An administrative note indicates that the UCR scheduled review of Plaintiff's appointment on May 23, 2016. (Doc. 40-3, p. 223).

Plaintiff had a follow-up appointment with heath Service on May 11, 2016. (Doc. 40-3, p. 225). The records indicate that Plaintiff still felt there was little improvement in his left eye. (Doc. 40-3, p. 225). Plaintiff's blood pressure medication was changed at this appointment. (Doc. 40-3, p. 225).

Plaintiff saw Defendant on May 15, 2012, at Heath Services. (Doc. 40-3, p. 226). At this appointment, it was noted that Plaintiff's increased levels of blood sugar. (Doc. 40-3, p. 226). The record indicates that Plaintiff was adamant about not starting insulin as a method to control his diabetes despite the changes in his blood levels. (Doc. 40-3, p. 226).

On May 23, 2016, Plaintiff's medical file was reviewed by the UCR. (Doc. 40-3, p. 227). According to the record, Plaintiff's total laser treatment, which was recommended by Dr. Fleming, was approved. (Doc. 40-3, p. 227). Mr. Nott, the medical records specialist, was informed on this approval on May 30, 2016. (Doc. 40-3, p. 227).

Prior to the surgery, on June 12, 2012, Plaintiff sought medical care with Health Services through an unscheduled sick call. (Doc. 40-3, p. 228). Plaintiff exhibited objective signs of pain and distress, and complained of loss of sight and "pain and flashing lights in left eye for two days" (also reported seeing well out of his right eye). (Doc. 40-3, p. 228). During PA-C Harold's examination, she was unable to elicit a reflex in the left eye, unable to view left eye's fundus, and the right eye had "dark patches in

right retinal field." (Doc. 40-3, p. 229). Harold scheduled an appointment for Plaintiff to see Dr. Fleming the next day. (Doc. 40-3, p. 229). At that appointment, Dr. Fleming scheduled surgery, which Plaintiff consented to, for June 26, 2012, in which Plaintiff "will have trans pars plana vitrectomy and endophotocoagulation OS." (Doc. 40-3, p. 231, 240). Incidentally, earlier Documents indicate conflicting recommendations; Dr. Fleming had planned to observe the left eye while recommending surgery on Plaintiff's right eye, and the URC review approved "total laser treatment OD". (Doc. 40-3, p. 210, 214, 227). Defendant cosigned the appointment with Fleming the next day, June 14, 2012. (Doc. 40-3, p. 233).

In anticipation of Plaintiff's surgery, Plaintiff had a pre-operative evaluation at Health Services on June 20, 2012,  (Doc. 40-3, p. 246). A physical cleared Plaintiff for surgery, an EKG was performed, and Plaintiff was instructed not to take NSAID's or Aspirin. (Doc. 40-3, p. 246, 248). Six days later, on June 26, 2012, Dr. Fleming performed the surgery on Plaintiff's left eye. (Doc. 40-3, p. 251). The post-operative plan consisted of a patch on Plaintiff's left eye, and a prescription for two different types of medicated eye drops, Ciloxan and PrednisoLONE Ace. (Doc. 40-3, p. 251). Plaintiff was given these drops the same day of the surgery. (Doc. 40-3, p. 251-52). Plaintiff was also instructed that he should inform the medical staff if he experiences any persistent nausea or vomiting, continual pain, bleeding at the surgical site, or a fever of 100 degrees or more. (Doc. 40-3, p. 251). Defendant cosigned for the post-operative plan the next day. (Doc. 40-3, p. 253).

After the surgery, Plaintiff attended two follow-up appointments with Dr. Fleming. (Doc. 40-3, p. 265, 269). At the first follow-up, two days after the surgery, Plaintiff was prescribed two additional medicated drops, as well as two new prescriptions for the drops he was given immediate following the surgery: Brimonidine Tartrate 0.2% and Timolo Maleate 0.5%, and Ciloxan and PrednisoLONE respectively. (Doc. 40-3, p. 265). At the second follow up, Plaintiff was prescribed more prednisoLONE and Brimonidine. (Doc. 40-3, p. 269). Defendant cosigned for both of the above appointments. (Doc. 40-3, p. 267, 271). Thereafter, no additional follow-ups were schedule with Dr. Fleming prior to Plaintiff's release on August 8, 2012. (Doc. 40-3, p. 269, 275).

**Legal Standards**

**1.  Summary Judgment Standard**

Summary judgment is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  ***Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (citing Fed. R. Civ. P. 56(a)).**  The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and/or information obtained via discovery—the lack of any genuine issue of material fact.  ***Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).**  In determining whether a genuine issue of material fact exists, the Court must view the record in a light most favorable to the nonmoving party.  ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).**

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.***, 528 F.3d 508, 512 (7th Cir. 2008)**.

## 2. Eighth Amendment Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley***, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble***, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.***, 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**. The Eighth Amendment does not require that prisoners receive unqualified access to health Care; rather, prisoners are entitled to only "adequate medical care." *Johnson v. Doughty***, 433 F.3d 1001, 1013 (7th Cir. 2006) (quoting *Boyce v. Moore***, 314 F.3d 884, 888-89 (7th Cir. 2002)); *see also Forbes v. Edgar***, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her.")**. The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care. *Johnson***, 433 F.3d at 1013.**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011),** *citing Johnson v. Snyder*, **444 F.3d 579, 584 (7th Cir. 2006).** First, the prisoner must show he has an objectively serious medical need. *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).** *Accord Greeno*, **414 F.3d at 653.** A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** *Accord Farmer v. Brennan*, **511 U.S. 825, 828 (1994) (violating the** *Eighth Amendment* **requires "deliberate indifference to a** *substantial* **risk of** *serious* **harm.") (internal quotation marks omitted) (emphasis added).** Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652–53.**

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* **at 653.** The plaintiff need not show the physician literally ignored his complaints, just that the physician was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).** However, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, **631 F.3d 843, 857 (7th Cir. 2011)** *(quoting Sain v. Wood,* **512 F.3d 886, 894-95 (7th Cir. 2008) (internal quotation marks omitted)).** There is

not one proper way to practice medicine in a prison, but a range of acceptable courses that must reflect professional judgment, practice or standards. ***Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).** Notwithstanding, persisting in a course of treatment known to be ineffective states a claim under the Eighth Amendment. ***Greeno*, 414 F.3d at 655 (finding deliberate indifference where medical defendants persisted in a course of conservative treatment for eighteen months despite no improvement).** Deliberate indifference may also be shown when a medical provider refuses to refer a patient to a specialist for treatment of a painful medical condition that clearly requires a referral. *See Berry v. Peterman*, **604 F.3d 435, 440 (7th Cir. 2010);** *Snyder v. Hayes*, **546 F.3d 516, 526 (7th Cir. 2008).**

## DISCUSSION

Defendants conceded in their motion that Plaintiff's condition was a serious medical need. (Doc. 40, p. 16).  Regardless of this concession, Plaintiff's medical condition nonetheless qualifies as a serious medical condition under deliberate indifference. *See, Henderson v. Sheahan*, **196 F.3d 839, 846 (7th cir. 1999). ("A serious injury or medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.).**  Plaintiff complained of vision problems to the point where he could no longer see out of his left eye.  Pointedly, Dr. Montgomery recommended a surgical consult "ASAP" after diagnosing Plaintiff's condition.

However, the Government disputes the subjective prong of the deliberate indifference standard.  Plaintiff argues that Defendant was deliberately indifferent by

deliberately delaying care, both before and after Plaintiff received surgery, which thereby caused Plaintiff to lose vision in his left eye.  *See Langston v. Peters,* **100 F.ed 1235, 1240-41 (7ᵗʰ Cir. 1996)(Noting that a delay in treatment can rise to the level of deliberate indifference).** But, defendant did not delay or deny medical treatment, and therefore cannot be found deliberately indifferent to Plaintiff's serious medical condition.

### a) Delay in care prior to surgery

The record supports an inference that Plaintiff's surgery may have been significantly delayed.  Following Plaintiff's right eye surgery in December 2010, Dr. Maher recommended a follow-up in one to two weeks so he could perform surgery on Plaintiff's left eye.  Yet, it was a year later when this surgery finally occurred.  This delay *may* have exacerbated Plaintiff's condition when one considers that a licensed ophthalmologist recommended a surgical procedure for a serious medical condition that was delayed by a year.

Notwithstanding the above, this initial delay cannot be attributed to the Defendant because he had no control or knowledge of Plaintiff's condition until five months later.  It is not until May 2011, before Defendant was aware of Plaintiff's condition, as that was when Plaintiff wrote medical treatment requests to BOP staff members complaining of loss of vision and blurry vision.  While it is worth mentioning that Plaintiff's first appointment with Defendant occurred in April 2011, there is no evidence suggesting Defendant was made aware of any vision problems; the records note that plaintiff had "no complaints," and the documents strongly suggest it was

merely to refill medications.  Because subjective knowledge of—an excessive risk to inmate health is necessary to a deliberate indifference claim, *Greeno*, **414 F.3d at 653,** the first five months that Plaintiff's treatment was potentially delayed has no bearing on Defendant.

After being made aware of possible complications, there is nothing to suggest that Defendant delayed care. Rather, Defendant, seemingly without hesitation, scheduled Plaintiff with a specialist, which took place a month later.  After that, he scheduled an appointment with a surgical consults a month following the specialist. The month delay from acquiring notice of a medical condition to then seeing a specialist, and from specialist to consult, are minor considering Plaintiff was in prison and the consultation was conducted off-site. *See Berry*, **604 F.3d at 443. ("Anyone who has ever visited a doctor's office knows that some delays in treatment are inevitable, particularly absent a life-threatening emergency. Such delays are even more likely in the prison environment.").** Thus, these cannot be considered delays in treatment.

Further, after setting up the above appointments, which ultimately led to the surgery, there is nothing suggesting Defendant delayed Plaintiff's treatment. Following the appointment with the surgical consult, it was recommended that Plaintiff be reevaluated in one month. Defendant is not trained to treat the diagnosis given by the specialist; it is instead appropriate for him to defer to their judgment. As such, Defendant cannot be held accountable for the additional month that Plaintiff was forced to wait before surgery was finally recommended. Moreover, after surgery was recommended, Plaintiff is not responsible for scheduling the surgical times; thus, the

two-month delay between (1) approval of the surgery and (2) Defendants actual surgery, again, cannot be attributed to Defendant. Therefore, considering defendant's responsibilities and capabilities, he more than reasonably responded to Plaintiff's serious medical need.

### b) Delay in care after the surgery

Plaintiff's claims of deliberate delayed following the surgery are equally unfounded. A month after the surgery, Plaintiff complained of pain and loss of vision. That *same* day he had an appointment with the surgeon, who performed a fluid-to-fluid exchange to alleviate Plaintiff's symptoms. Notably, records indicate that two days later, Plaintiff indicated his left eye was feeling better. Following this, Plaintiff received nearly monthly follow-ups with his surgeon: February 2, and 13, March 12, and May 7, all were dates in which Plaintiff saw the surgeon. Considering the potential cost of off-site appointments with a licensed practitioner specializing in ophthalmology, and the constant follow-up appointments regarding Plaintiff's condition, Defendant's response seems more than reasonable. *See Ralston v. McGovern*, **167 F.3d 1160, 1162 (7th Cir. 1999) ("The civilized minimum is a function both of objective need and of cost.").** Further, following the May 7 appointment, the surgeon recommended that the left eye be observed for future consideration pending the blood clearing from the eye. Regardless of the delay suggested by the surgeon, Plaintiff received a second surgery on his left eye June 26, 2011, only a month and a half after the May 7 appointment. As noted above, but worth reiterating, Defendant is merely responsible for referring patients too specialist; he defers to the recommendations of the specialist, and has no

control over scheduling. Based on the constant scheduling of follow-up appointments, which were carried out by a surgical consult, and off-site, it is unreasonable to infer that Defendant was, or was making attempts to delay Plaintiff's treatment.

Even assuming, *arguendo*, that Defendant did delay Plaintiff's treatment, Plaintiff has failed to supply the record with the necessary evidence that the possible delays did in fact lead to his vision loss. **Langston, 100 F.3d at 1240. ("an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.").** Instead, Plaintiff merely asserted this conclusion in his complaint.  This fails to take into account the many complications that can result from surgery—complications not attributable to Defendant—and fails to take into account the possibility that his eating habits and the underlying diabetes were ultimately responsible. Thus, Plaintiff's claims would fail on this account as well.

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment (Doc. 40) be **GRANTED**, and that judgment be entered in Dr. Kruse's favor.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. ***See, e.g.,***

*Snyder v. Nolen*, **380 F.3d 279, 284 (7th Cir. 2004).** Accordingly, Objections to this Report and Recommendation must be filed on or before **July 18, 2016.**

IT IS SO ORDERED.

DATED: June 30, 2016

/s/ *Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge